**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Thomas DIXON, Defendant-Appellant.**

**No. 44769.**

Missouri Court of Appeals,
Eastern District,
Division One.

May 24, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied July 15, 1983.

Application to Transfer Denied
Sept. 20, 1983.

Leonard Frankel, Clayton, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GAERTNER, Judge.

Defendant was found guilty by a jury of the offense of murder in the second degree, § 565.004, RSMo 1978, and sentenced to 50 years imprisonment.

On October 20, 1979, there was a party held in a residence in St. Louis County celebrating the 20th birthday of Cherie Lyn Schmidt. Although not invited to the party, defendant attended with a friend of his who had been invited. The guests consumed a considerable quantity of beer and liquor. At some time between 11:00 p.m. and 11:30 p.m., Cherie left the party with defendant. When they had not returned some time after 11:30 p.m., the host and one of the guests went outside to look for her. Defendant's automobile, a red Mustang, was still parked where it had been earlier. They looked inside the car and it was unoccupied. Cherie's car was also empty. Cherie was never seen alive again.

Investigating her disappearance, the police questioned defendant on November 2, 1979. Defendant informed Detective Dies that they left the party because Cherie wanted to buy cigarettes. She also wanted to see his new car. He said they had driven to a 7-11 Store in the neighborhood where she got out of the car. She soon returned, defendant claimed, stating she had met a friend and was going with the latter to another party. She said she would return to the birthday party later. Thereafter, defendant reported to Detective Dies that he had received several anonymous telephone calls threatening him if he did not "come up with Cherie."

On November 17, 1979, Cherie's purse was discovered under a bush in the front yard of a residence not far from the party. The purse contained Cherie's identification, a small amount of cash, and, among other items, a half-full package of cigarettes. On the same day, her clothing was discovered partially submerged near the bank of a nearby lake. The lake was dredged and later drained but nothing further was found. Early in the morning of November 20, 1979, the police questioned employees of the 7-11 Store. They recognized a photo-graph of Cherie as she was a regular customer of the store. They were positive Cherie had not been in the store on the night of her disappearance. Later that same morning, Detective Dies received a telephone call from defendant's father reporting that defendant had been the victim of a robbery. It developed that on Monday evening, November 19, 1979, defendant had appeared at the home of a friend. The friend and his parents stated that defendant had an abrasion and swelling on his forehead, was dissheveled, incoherent and appeared to be not completely conscious. They put him to bed and called defendant's parents who brought him home the next morning. Defendant related that he had been assaulted and robbed of his car, wallet and shoes on the night of the 18th. He did not say where he had spent that night or the next day. Detective Dies told defendant's father to bring him to the police station. Accompanied by his father and sister, defendant arrived at the station at about 12:30 p.m. He told Dies his story about the robbery. Defendant was then taken, alone, to an interrogation room while his father and sister remained in a waiting room.

The interview was conducted by Detectives Dies and Reinhardt and was tape recorded. He was read the *Miranda* warnings and given a waiver of rights form containing the same warnings. He read this form and signed it. He was told that police investigation had revealed discrepancies between his story and what others had said. Defendant was questioned until 2:30 p.m. adamantly repeating his story about leaving Cherie at the 7-11 Store. He was not asked about being the victim of a robbery. He declined offers of food and drink. He did not ask for a lawyer, to see his father or sister, nor for an end to the questioning. He agreed to take a polygraph. One of the two officers left the room to prepare for the administration of the polygraph. The other remained in the interview room with defendant until about 4:00 p.m. Had defendant asked, he would not have been permitted to see his father or sister during that time.

The polygraph examiner was Officer Yarborough. He had been briefed regarding the facts then known by the police including the discrepancies about the location of defendant's car after 11:30 p.m. and the 7–11 Store employees' denial of Cherie's appearance. Yarborough went over these facts with defendant in a pre-test interview. He explained the purpose and function of the polygraph machine. Defendant read, said he understood, and signed a waiver form in which he agreed to voluntarily take the polygraph test. The form also repeated the *Miranda* warnings.

Yarborough reviewed in advance the twelve questions he proposed to ask in the test. Of the twelve, four were key questions, the other eight only for comparison. He ran the test three times between 5:45 p.m. and 6:05 p.m., asking all twelve questions each time. The tracings showed deception to all four key questions and defendant was so advised.[1] Yarborough continued to interrogate him. About 7:00 p.m., defendant began to change his story. After about thirty more minutes, defendant admitted that he and Cherie had indulged in kissing and fondling in his car. She disrobed with his assistance. He said she taunted him about his sexual inadequacy, and he blacked out. A few minutes later, he admitted that he choked her while in the car because she was making fun of him. Subsequently, although defendant refused to write his statement or go to the scene

with the police, he drew one map showing where he had disposed of her body, and, upon request, a second more detailed map. The police found the body where designated by defendant. It was covered by leaves and so badly decomposed the medical cause of death could not be determined by autopsy. Defendant also told the police that upon learning of the discovery of Cherie's clothes, he drove to Arkansas, but changed his mind and returned to St. Louis. He then fabricated the story of the robbery, and played it out by discarding his possessions in a sewer, and striking himself on the forehead. After defendant gave these statements, he took the police to the location of his belongings.

■■■ As his first point on appeal, defendant eloquently asserts that his confession was obtained in violation of the Fourth and Fourteenth Amendments of the United States Constitution. He argues that his detention at the police station constituted an unlawful seizure of his person and therefore his confession made seven hours after arrival at the station should have been excluded. The state counters this argument by contending there was no seizure since defendant's presence at the police station was purely voluntary and because his waiver of his *Miranda* rights was curative of any taint resulting from an illegal arrest. Although we reject the state's contentions on this point,[2] we find no Fourth Amendment

1. Prior to the commencement of the trial, defendant's attorney advised the court of his intention to introduce evidence relating to the polygraph test. He stated he wished to offer this evidence on the jury issue of voluntariness of the confession. Immediately prior to Yarborough's testimony, the court orally admonished the jury in language agreed to by the parties. In effect, the admonition was that evidence relating to the polygraph test was not offered for the purpose of establishing defendant's guilt or innocence, but should be considered only on the issue of whether defendant's statement was voluntary or involuntary.

2. There are differing interests and policies served by the exclusion of confessions obtained in violation of constitutional rights secured by the Fourth Amendment as compared to the Fifth Amendment. Contrary to the state's assertion, waiver of *Miranda* rights *alone* does

not serve to remove the taint of a Fourth Amendment violation resulting from arrest without probable cause. *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Further, the seizure of a person triggering Fourth Amendment Rights occurs when that person's freedom of movement is restrained by physical force or a show of authority. Such restraint exists when "a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). At some point between defendant's voluntary appearance at the police station and the making of his inculpatory statements, a belief that he was not free to leave would have certainly been reasonable. While it is not necessary to pinpoint the exact moment at which what started as a consensual

violation for the reason that the investigation by police had disclosed information more than sufficient to support a determination of probable cause to arrest the defendant.

An arrest with or without a warrant requires probable cause, which simply means a knowledge of facts and circumstances sufficient for a prudent person to believe the suspect is committing or has committed *an* offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223 [225], 13 L.Ed.2d 142 (1964); *State v. Robinson,* 484 S.W.2d 186, 189 (Mo.1972). ... While the quantum of information necessary to fashion probable cause means more than mere suspicion, *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168 [171], 4 L.Ed.2d 134 (1959); *State v. Hicks,* 515 S.W.2d 518, 521 (Mo.1974), its existence must be determined by practical considerations of everyday life on which reasonable persons act and not the hindsight of legal technicians. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302 [1310], 93 L.Ed. 1879 (1949); *State v. Wiley,* 522 S.W.2d 281, 287 (Mo. banc 1975). All information known to the officers and the reasonable inferences therefrom bear on the determination of that issue.

*State v. Heitman,* 589 S.W.2d 249, 253 (Mo. banc 1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed.2d 795 (1980), *reh'g denied,* 448 U.S. 912, 101 S.Ct. 29, 65 L.Ed.2d 1174.

Prior to the commencement of any interrogation of defendant on November 20, 1979, the investigating officers were in possession of the following information. Cherie Schmidt was last seen thirty-one days before when leaving her birthday party between 11:00 and 11:30 p.m. in the company of defendant. Defendant did not return to the party, leaving his friend without transportation home. Defendant's statement that they drove immediately to the 7–11 Store so Cherie could purchase cigarettes was refuted on three counts: (1) his car was

seen where it had earlier been parked by members of the party who went looking for Cherie when she had not returned after 11:30; (2) two employees of the 7–11 Store were certain Cherie had not been there on the night of her disappearance; (3) a half-full package of cigarettes was found in Cherie's purse. Defendant stated he was receiving anonymous telephone calls accusing him of involvement in Cherie's disappearance. Despite intensive investigation and widespread publicity, no information as to Cherie's whereabouts had been discovered or reported. Twenty-eight days after her disappearance, her purse was found under a bush and her clothing was found partially submerged in a lake, both in the general neighborhood of where she had been last seen in the company of defendant. Tested by "practical considerations of everyday life on which reasonable persons act," this information and the reasonable inferences therefrom exceed mere suspicion that Cherie had met with foul play at the hands of defendant. We find this information to constitute probable cause to have arrested defendant. To establish probable cause "[m]uch less evidence than is required to establish guilt is necessary." *State v. Dodson,* 491 S.W.2d 334, 336 (Mo. banc 1973). The existence of probable cause to detain defendant made his detention at the police station "reasonable" within the meaning of the Fourth Amendment. Defendant's subsequent confession, therefore, is not tainted as the product of an illegal seizure of the person and was properly admitted at trial. Defendant's point has no merit.

Defendant also alleges error in the overruling of his motion to suppress on Fifth Amendment grounds, arguing that his statements were not made voluntarily but were extracted through coercive measures.

Allegations by a criminal defendant that his inculpatory statements, while being held in custody, are not admissible be-

inquiry turned into a custodial interrogation, the giving of the *Miranda* warnings before any questioning regarding Cherie's disappearance is indicative of the officers' belief that he was

then in custody. Otherwise, no warnings would have been necessary. *State v. Greathouse,* 627 S.W.2d 592, 595 (Mo.1982).

cause involuntarily made create a situation where the state must bear the burden of proving the voluntariness of the confessions. *Lego v. Twomey,* 404 U.S. 477, 486, 92 S.Ct. 619, 625, 30 L.Ed.2d 618, 626 (1972); *State v. Hughes,* 596 S.W.2d 723, 726 (Mo. banc 1980). The state must prove that the statements were in fact voluntary by a preponderance of the evidence. *Lego, supra; Hughes, supra.* On appeal, the question is "whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given." *Hughes, supra,* at 727, citing *State v. Alewine,* 474 S.W.2d 848, 852 (Mo.1971).

*State v. Mahaney,* 625 S.W.2d 112, 113 (Mo. banc 1981).

■ The trial judge heard evidence on the motion to suppress and found the defendant's statements were made voluntarily. The jury was instructed, by an MAI–CR2d 3.44 submission, concerning the issue of voluntariness and was told to disregard the confession if they found the statements were not voluntarily and understandingly made. Mindful of our responsibility to give due regard to the opportunity of the trial court to judge the credibility of the witnesses, *State v. Higgins,* 592 S.W.2d 151, 158 (Mo. banc 1979), *appeal dismissed,* 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980), and the rule that the admission of a confession by the trial court is a matter of discretion not lightly to be disturbed, *State v. Flowers,* 592 S.W.2d 167, 170 (Mo. banc 1979), we look to defendant's attack upon the finding of voluntariness.

Defendant contends the absence of "meaningfully time [sic] *Miranda* warnings" combined with the inherent pressure of the polygraph examination and his psychological inability to cope with stressful situations constituted "psychological coercion" rendering the statements involuntary. Defendant introduced the testimony of a psychiatrist, Dr. Shopper, who expressed the opinion that defendant's innate inability to tolerate stress would cause him to seek escape from several hours of police interrogation, especially when considered in the light of long abstinence from food and drink, separation from his father and sister, and the self-inflicted blow to the head. Dr. Shopper, therefore, considered the "extremely skillful" interrogation to constitute psychological coercion. He testified "As I understand voluntary, I would say it [defendant's guilt] was certainly denied many, many times prior to this point. And it was only at the end of sustained and prolonged stress and very skillful, stressful interrogation that this came forth and I would regard it as not voluntary—if you have to take it yes or no, a black and white kind of stance here." He conceded that the easiest escape from such an intolerable situation would be simply to tell the truth. In rebuttal, Dr. Joseph Schuman, a psychiatrist testifying on behalf of the state, reached an opposite conclusion. It was his opinion that only conduct or threats amounting to physical or mental "torture" could cause a confession to be involuntary. Neither of these conflicting psychiatric opinions is compatible with nor predicated upon the legal distinction between voluntary and involuntary confessions.

In order to be voluntary, a confession must be "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). The fifth amendment secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). Consequently, a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Id.* at 7, 84 S.Ct. at 1493 (quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)). A confession is involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). Law enforcement conduct which renders a confession invol-

untary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear "a rational intellect and a free will."

*United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981).

 Despite the fact that generalizations such as these are repeatedly used in attempts to define "voluntariness," the precise legal meaning of the term remains elusive. The courts have concluded that various factors such as age, experience, intelligence, education, infirmity and unusual susceptibility to coercion must be weighed upon a case by case basis. No single fact is dispositive but each factor and combinations thereof must be considered under a "totality of the circumstances" test to determine the voluntariness of a confession. *State v. Flowers,* 592 S.W.2d 167, 169 (Mo. banc 1979). In making such determination we must also be mindful of the rationale underlying the suppression of involuntary confessions without regard for the truth or falsity thereof. In addition to the likelihood that a confession obtained through coercive methods is unreliable, there exist the deep rooted principles that the police must obey the law while enforcing the law and the courts shall not be seen to place a stamp of approval upon illegally obtained evidence by permitting its admission. Indeed, deterrence of police misconduct and preservation of the integrity of the judicial system are the twofold purposes underlying the use of the exclusionary rule, here invoked by the defendant, as a means of effectuating the Fourth and Fifth Amendments to the United States Constitution. The appearance of judicial ratification of illegal police conduct inherent in the admission in evidence of the fruits of such conduct was never more eloquently condemned than by the words of Justice Brandeis in his dissenting opinion in *Olmstead v. U.S.,* 277 U.S. 438, 483–85, 48 S.Ct. 564, 574–75, 72 L.Ed. 944, 959–60 (1928):

Will this court, by sustaining the judgment below, sanction such conduct on the part of the executive?

. . . The court's aid is denied . . . in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. . . .

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

This purpose is evidenced further by the connotation of the words used repeatedly by the courts in making determinations regarding the voluntariness of confessions. It is the *extraction* of the inculpatory statement by *threat, violence,* or *improper* influence; the *coercion* by physical *intimidation* or psychological *pressure* which *overbears* an *unfettered* exercise of free will which are condemned. Therefore, susceptibility of an accused person to psychological pressure is but a single factor for consideration. Standing alone, and absent some illegal or improper conduct on the part of the police in extracting an inculpatory statement, which conduct cannot be sanctioned by a judicial stamp of approval, psychological compulsion to admit guilt does not render a confession legally involuntary.

 Accordingly, we search the transcript of the interrogations herein for any illegal or improper police action which may be said to have had an overbearing effect upon defendant's will. We find none. *Miranda* warnings were given orally and in writing, the latter read and signed by defendant, before any questioning began. After defendant agreed to take a polygraph

test and the details of the test and the function of the polygraph equipment was explained to him, he read a form stating the test was being taken voluntarily and containing the *Miranda* warnings. Again, he said he understood and he signed this form. This was approximately 5:45 p.m. After the administration of the three polygraph examinations and after being advised that they indicated deception, defendant began to change his story. On appeal he asserts the failure to repeat the *Miranda* warnings during this period of one hour between the giving of the polygraph and his first admissions caused the warnings to be not meaningfully timed. We are not cited to nor can we find any authority supporting such a contention. On the contrary, "mere lapse of time between the receipt of *Miranda* warnings and the giving of inculpatory statements does not require the exclusion of the statements." *State v. Groves,* 646 S.W.2d 82, 85 (Mo. banc 1983). We find it practically unrealistic and legally unnecessary for an interrogating officer to stop an accused person on the verge of making an incriminating statement and remind that person of the three prior admonitions that he does not have to answer any more questions and that if he does his answers will be held against him.

■ Defendant does not contend and the record does not reflect that he was in any way mistreated during the time he was at the police station. Rather, he contends that statements by Detective Yarborough to the effect that what people were thinking would be changed if the truth were known constituted "subverting the obvious consequences" of admitting guilt. Further, he argues that telling the defendant "It's going to be better in the long run" if he would "get it out, out in the open" constituted a promise of leniency rendering the confession involuntary. These two separate and distinct statements do not mandate our overruling of the trial court's finding of voluntariness. The statement "It's going to be better in the long run" is shown by the transcript to be totally unrelated to any mention of possible charges or punishment. Rather, it follows Detective Yarborough's comment about his experiences in questioning people and his recognition that it is hard to "get it out" but "better in the long run." This is no more than a recognition of the undeniable fact that the worm of conscience gnaws incessantly at all but the most hardened and that the psychologically coercive effect of the knowledge of guilt is alleviated by open admission. We note that following defendant's change of story and the making of several inculpatory admissions, he admitted he was feeling better and for the first time accepted the offer of a soft drink.

The statement concerning what others might be thinking is contained in the same paragraph as Yarborough's statement that if the truth were known "[w]here does that fall back on, it falls back on you." When read in context of the full forty-three pages of the transcript of this final stage of interrogation, the two statements singled out by defendant constitute examples of skillful and perhaps adroit questioning, but can hardly be said to amount to promises of leniency or misconduct tending to overcome the free will of the defendant. We find substantial evidence to support the finding of the trial court and the determination implicit in the jury's verdict that defendant's confession was voluntarily and understandingly made.

Defendant contends in his third point on appeal that the trial court abused its discretion in refusing to allow defense counsel to question Detective Reinhardt during the suppression hearing concerning Reinhardt's possible pecuniary interest in a True Detective Magazine article about the case. The article, published six months after the victim's disappearance, gives a detailed account of the police investigation and includes police photographs. It purports to quote extensively from Detective Dies and Detective Reinhardt. At the pre-trial suppression hearing defense counsel sought to cross-examine Detective Reinhardt regarding whether he knew who had sold the story to True Detective Magazine, and whether the knowledge of the possibility of selling the story figured in the "extraordi-

nary" efforts the officers expended in obtaining a confession from Tom Dixon. The state's objection to this line of questioning was sustained on relevancy grounds.

When an objection is sustained to proffered evidence, the party offering the evidence must demonstrate its relevancy and materiality by way of an offer of proof in order to preserve the matter for appellate review. *State v. Brown,* 604 S.W.2d 10, 16 (Mo.App.1980). The offer of proof must state facts which are specific and sufficient in detail to establish the admissibility of the evidence sought to be introduced. *State v. Umfrees,* 433 S.W.2d 284, 286 (Mo. banc 1968). Mere statements and conclusions of counsel are not sufficient. *Kinzel v. West Park Investment Corp.,* 330 S.W.2d 792, 796 (Mo.1959); *Duncan v. Price,* 620 S.W.2d 70, 71 (Mo.App. 1981); *Hawkins v. Whittenberg,* 587 S.W.2d 358, 363 (Mo.App.1979).

> It has long been the rule in this state that the proper procedure to present and preserve such an offer is to have the witnesses present; put them on the stand; propound the questions; and thus enable the trial court to intelligently rule upon, and an appellate court to review, the propriety and admissibility of the evidence sought to be elicited, *Northwestern Stove Repair Co. v. Cornwall,* 148 Mo.App. 605, 128 S.W. 535, 537[6] (1910); *Bowe v. Kehr,* 345 S.W.2d 224, 227[3] (Mo.1961).

*State v. Sullivan,* 553 S.W.2d 510, 513 (Mo. App.1977). *See also Tennis v. General Motors Corp.,* 625 S.W.2d 218, 235 (Mo.App. 1981); *In Re Marriage of H.B.,* 559 S.W.2d 73, 75 (Mo.App.1977).

Although an offer of proof in question and answer form is preferable, this rule is not ironclad. An offer may be in narrative form so long as the offer is definite, is specific, is not mere conclusions of counsel, and sets out sufficient facts to demonstrate the admissibility of the evidence. *McMillin v. McMillin,* 633 S.W.2d 223, 225 (Mo.App.1982). *See Stipp v. Tsutomi Karasawa,* 318 S.W.2d 172, 175 (Mo. 1958). When a party fails to provide the offer in question and answer form, the risk is present that a reviewing court will find the offer insufficient. *Stapleton v. Griewe,* 602 S.W.2d 810, 813 (Mo.App.1980). Such is the situation here.

Defendant did not make his offer of proof by examining Detective Reinhardt in question and answer form—the preferable method to establish specific facts and to demonstrate relevancy. Rather defendant's offer of proof was in narrative form containing mere speculative conclusions. The only specific fact offered by the defendant was the existence of the magazine article. Defendant stated that since the information contained in the article was so detailed, it "had to come from the police authority." Defendant concluded that "if, in fact, the officers were aware of the possibility of selling such a story, it could have influenced the manner and method and motive of the officers in taking statements from Mr. Dixon."

Defendant did not offer specific facts on how the magazine obtained the information contained in the article or who at the police station provided the information. A review of the record of this case shows that defendant made no attempt, either independently or by request to the prosecution, to secure this information prior to the suppression hearing.

The proper time to uncover specific facts sufficient to make an effective offer of proof in narrative form is pre-trial discovery. The rules of criminal discovery in Missouri are meant to extend fundamental fairness to criminal defendants by permitting them an opportunity to prepare in advance of trial. *State v. Johnson,* 524 S.W.2d 97, 101 (Mo. banc 1975); *State v. Doney,* 622 S.W.2d 227, 232 (Mo.App.1981). Under Rule 25.02, defendant had the right to discover information concerning the True Detective Magazine article upon request to the prosecution or by motion for discovery. In addition, Rule 25.12 authorizes defendant to obtain the deposition of any person on oral examination or written questions. Defendant clearly had means available to him prior to the suppression hearing to discover the desired information. Moreover, there

was no difficult time constraint. The article was published in the June 1980 issue of True Detective Magazine and the suppression hearing was held beginning April 27, 1981—fully ten months later.

 Defendant's narrative offer of proof contained only speculative and conclusory statements of counsel. As such it was insufficient in the absence of more specific and definite facts. *Kinzel v. West Park Investment Corp.,* 330 S.W.2d at 796; *Duncan v. Price,* 620 S.W.2d at 71. Defendant, therefore, failed to demonstrate the relevancy of the True Detective Magazine article to the circumstances surrounding defendant's questioning and confession. Defendant's point has no merit.

 Defendant next argues that the verdict directing instruction fatally varied from the indictment in that it set forth a hypothesis of the crime not charged in the indictment. Defendant contends the trial court erred in submitting the flawed verdict director to the jury. In essence, his argument is that since the indictment [3] charged that he "intentionally ... killed," it was a material and fatal variance to instruct the jury that he could be found guilty of murder in the second degree if he "caused the death of Cherie Lyn Schmidt" while merely intending to "cause serious bodily harm to Cherie Lyn Schmidt." [4] A variance between the language of an indictment and the words of an instruction is not fatal unless it is material to the merits of the case and prejudicial to the rights of the accused. *State v. Grays,* 629 S.W.2d 466, 469–70 (Mo.App.1981); *State v. Kirk,* 510 S.W.2d 196, 201 (Mo.App.1974). First of all, we note that the prosecutor in the indictment and the trial court in Instruction No. 7 both followed the format of indictments and instructions approved by the Supreme Court with differing but authorized parenthetical insertions. MACH–CR and MAI–CR have been adopted pursuant to Supreme Court Rules 23.01 and 28.02. In exercising this rulemaking power, the Supreme Court is constitutionally prohibited from changing the substantive law. Article V, Section 5, Missouri Constitution of 1945. Therefore, *pattern indictments and instructions must be interpreted in the light of the existing statutory and case law of Missouri.*

 It is a well established principle of criminal law that the intent of an actor focuses upon the commission of the act rather than the achievement of a result.

Appellant's protestation that he did not intend to hurt anybody is no excuse and does not serve to reduce the crime from second degree murder to manslaughter. A man is presumed to intend the natural and probable consequences of his intentional acts, *State v. Martin,* 364 Mo. 258, 260 S.W.2d 536, 539, particularly where his conduct is unlawful and dangerous to the safety and lives of others. General criminal intent is found "when from the circumstances the prohibited result may reasonably be expected to follow from

---

**3.** The St. Louis County Grand Jury charged defendant with murder in the second degree "in that defendant intentionally, premeditatedly, with malice aforethought and unlawfully killed Cherie Lyn Schmidt by choking and striking her on or about October 20, 1979, in the County of St. Louis, State of Missouri, thereby causing her to die on or about October 20, 1979, in the County of St. Louis, State of Missouri."

This indictment is identical to the language of MACH–CR 16.14, the conventional indictment for murder in the second degree.

**4.** Instruction No. 7, the verdict directing instruction, states in relevant part:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about October 20, 1979 in the County of St. Louis, State of Missouri,

the defendant caused the death of Cherie Lyn Schmidt by choking and striking her, and

Second, that the defendant intended to take the life of or cause serious bodily harm to Cherie Lyn Schmidt, and

Third, that the defendant did not do so in anger, fear, or agitation suddenly provoked by the unexpected acts or conduct of Cherie Lyn Schmidt, and

Fourth, that the defendant was not in such an intoxicated or drugged condition that it prevented him from acting purposely or knowingly as submitted in Instruction No. 9, then you will find the defendant guilty of murder in the second degree.

Instruction No. 7 is identical to the language of MAI–CR2d 15.14, the conventional verdict director for murder in the second degree.

the offender's voluntary act, irrespective of any subjective desire to have accomplished such result. One cannot excuse the probable consequences of his own voluntary act by claiming that he had a mental reservation and performed the act or acts voluntarily done without an intent." 22 C.J.S. Criminal Law § 35, quoted with approval in *State v. Anderson,* Mo.Sup. en Banc, 384 S.W.2d 591, 607[34].

*State v. Shuler,* 486 S.W.2d 505, 509 (Mo. 1972).

■ Therefore, although the juxtaposition of the words of MACH–CR 16.14 may violate the grammatical principle that modifiers should be placed next to the words they modify, "intentionally," as used therein, must be interpreted as modifying the *act* performed—in this case the "choking and striking." To hold otherwise would require us to rule that the Supreme Court, in approving the use of MACH–CR 16.14 under its rulemaking power, changed substantive rights by imposing upon the state the burden of proving a subjective intent to accomplish a result—a much greater burden than that of proving the commission of a volitional act. Rules of grammatical construction must bow before constitutional principles.

■ Instruction No. 7, MAI–CR2d 15.14, must be interpreted in similar fashion. The essential elements of murder in the second degree are the willful, premeditated killing of a human being with malice aforethought. *State v. Franco,* 544 S.W.2d 533, 535 (Mo. banc 1976), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). "Willfully" means "intentionally" or "knowingly." *State v. Shuler,* 486 S.W.2d at 509. "Malice" is the intentional doing of a wrongful act without just cause or excuse. *State v. Meaney,* 563 S.W.2d 117, 119 (Mo.App.1978). "Premeditation" simply means the defendant thought about what he was about to do before he did it. *State v. Lieberknecht,* 608 S.W.2d 93, 99 (Mo.App.1980). Instruction 7, MAI–CR2d 15.14 requires the jury to find each of these elements: (1) willfulness in paragraph

fourth "that the defendant was not in such an intoxicated or drugged condition that it prevented him from acting purposely or knowingly as submitted in instruction No. 9"; (2) premeditation in paragraph third "that the defendant did not do so in anger, fear or agitation suddenly provoked by the unexpected acts or conduct of Cherie Lyn Schmidt"; and (3) malice aforethought in paragraph second "that the defendant intended to take the life of or cause serious bodily harm to Cherie Lyn Schmidt." The instruction exemplifies the approach taken by the drafters of MAI–CR—that where, for better understanding of jurors, "a word had to be defined, the definition was, for the most part, substituted for it." MAI–CR Comments, Foreword, p. 9. Therefore, the instructional requirement of a finding of intent in paragraph second is not a variance from the indictment, but rather is in compliance with the averment of malice aforethought, the essential pleading of a culpable mental state—the *mens rea,* or evil heart— with which the act was committed. Further, the averment of malice aforethought in the indictment serves the due process requirement of notifying the defendant that he is charged with intentionally committing an act with intent to kill or to cause serious bodily harm, because such an intent constitutes the culpable mental state essential to the offense of murder in the second degree. *State v. Winters,* 579 S.W.2d 715, 717 (Mo.App.1979).

■ In support of his contention on this point, defendant cites *State v. Shepard,* 442 S.W.2d 58 (Mo. banc 1969); *State v. Lusk,* 452 S.W.2d 219 (Mo.1970); and *State v. Miles,* 488 S.W.2d 219 (Mo.App.1972). His reliance upon these cases is misplaced. They deal with variances between the pleadings and the instructions which relate to the "method" of committing an offense rather than with the culpable mental state of the offender. In each of these cases, the court noted, in addition to the variance, an absence of any substantial evidence to support the added method of committing the crime. Defendant makes a similar contention here, but it is likewise without merit.

In his confession, defendant stated that he began to strangle Cherie, then hit her in the mouth, and when she was unconscious, strangled her some more. It cannot be disputed that death or serious bodily harm is certainly a natural and probable consequence of repeated acts of strangling a human being. "A man is presumed to intend the natural and probable consequences of his intentional acts." *State v. Shuler,* 486 S.W.2d at 509. This presumption, imposed upon defendant's own statements, supplies ample support for the submission of paragraph second of instruction No. 7.

Defendant's next point on appeal is that the trial court erred in failing to submit defendant's requested instruction defining "intended" to mean premeditation and malice, and then defining those terms. Defendant argues that this definitional instruction was necessary to aid the jury in distinguishing the elements of murder in the second degree from the elements of manslaughter.

▮▮▮ The Notes on Use 8 to MAI–CR 33.00 state that a term is not to be defined unless required or permitted by the Notes on Use of the submitted MAI–CR instruction. The Notes on Use of MAI–CR 15.14, the conventional second degree murder instruction submitted here, makes no reference to defining the word "intended." To have done so would have been erroneous and a violation of the concept of MAI–CR. *State v. Abram,* 537 S.W.2d 408, 411 (Mo. banc 1976); *State v. Tate,* 637 S.W.2d 67, 74 (Mo.App.1982).

> The word 'intends' or 'intentionally' are very ordinary terms and admit of no confusion with respect to their meaning. When further definition of such words is undertaken, it will result in a myriad of instructions formulated by various lawyers or judges according to their thoughts at the moment and will serve to confuse rather than to clarify.

*State v. Abram,* 537 S.W.2d at 411. This court has held that the rule of *Abram* is not abrogated because a manslaughter instruction is also submitted as a lesser included offense of second degree murder. *State v.*

*Tate,* 637 S.W.2d at 74. Moreover, this court has no authority to declare erroneous those instruction forms and their accompanying Notes on Use which have been adopted for standard use by the Supreme Court. *State v. Tate,* 637 S.W.2d at 74; *State v. Grady,* 577 S.W.2d 930, 931 (Mo.App.1979). Defendant's point has no merit.

Defendant's final point on appeal is that this court improperly granted a writ of mandamus to compel defendant to submit to a "mental" examination pursuant to the discovery provisions of Rule 25.06(B)(9). Defendant contends that the writ was wrongfully utilized to establish a legal right which did not previously exist.

In *State ex rel. Westfall v. Crandall,* 610 S.W.2d 45 (Mo.App.1980), this court decided this point by granting the writ of mandamus at issue here. We need not repeat what was said in *Crandall.* It is sufficient to say that the provisions set forth under Rule 25 establish a procedure for *mutual* pre-trial discovery between the prosecution and the defense. "Their desideratum is a quest for truth which promotes informed pleas, expedited trials, a minimum of surprise and opportunity for effective cross-examination." *State ex rel. Westfall v. Crandall,* 610 S.W.2d at 47 quoting *State v. Buckner,* 526 S.W.2d 387, 392 (Mo.App. 1975).

▮▮▮ Once the defendant raised the defense of diminished mental capacity, the state had the burden of proving that the defendant did *not* suffer from a mental disease or defect affecting his state of mind. The state's request, upon good cause being shown, that the defendant be examined by a psychiatrist of their own choosing is included within the meaning of Rule 25.-06(B)(9). Moreover, it is fully consistent with Rule 25's broad purpose of full and free discovery. Our criminal discovery rules are reciprocal—the equal rights for disclosure are necessarily tempered by the equal duty to disclose. "Discovery must be a two-way street." *Wardius v. Oregon,* 412 U.S. 470, 475, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82 (1973). We therefore decline defendant's

request to reverse our holding in *State ex rel. Westfall v. Crandall.*

The judgment of the trial court is affirmed.

SIMON, P.J., and STEPHAN, J., concur.