**STATE of Missouri, Respondent,**

v.

**W.J. McMIKLE, Appellant.**

**No. 13358.**

Missouri Court of Appeals,
Southern District,
Division Three.

May 31, 1984.

David Crader, Crader, Crader, Dolan & Dolan, Sikeston, for appellant.

John Ashcroft, Atty. Gen., Deborah Neff, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found appellant guilty of the class D felony of passing a bad check in the face amount of $150 or more, §§ 570.120.1 and .120.6(1), RSMo 1978, and assessed punishment at "no imprisonment but a fine, in an amount to be determined by the

court." The trial court sentenced appellant to pay a fine of $10,000.[1]

█ Appellant asserts the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence, Rule 27.02(j),[2] inasmuch as the evidence was insufficient to support a finding of guilty.[3] Appellant also assigns error in the denial of his motion to dismiss the information because it failed to charge a crime, the denial of his motion to dismiss because of prosecutorial vindictiveness, and the granting of the State's motion in limine. Appellant further contends that the trial court should have declared a mistrial because of an irregularity in the return of the verdict, and that he (appellant) should not have been prosecuted because the effect was to assist the complaining witnesses in collecting moneys due them from appellant in "civil disputes."

█ The thrust of appellant's attack on the sufficiency of the evidence is that it does not support a finding that he passed the check with the purpose to defraud. In ruling this issue, we consider the evidence and all favorable inferences reasonably to be drawn therefrom in the light most favorable to the jury's verdict, and disregard all contrary evidence and inferences. *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983).

So viewed, the evidence establishes that on September 9, 1982, appellant opened an account with The Salcedo Company ("Salcedo"), a Missouri corporation whose office is in Scott County, and whose business is "trading commodities." Salcedo's corporate shares are owned in equal portion by Kenneth Edward Cantrell, Kenneth Wayne Anderson and Floyd Flair Ferrell. Cantrell, the secretary-treasurer, is licensed for conducting the trading of commodities by the Commodity Futures Trading Commission, a "national licensing organization."

When appellant opened his account, Salcedo was an agent for Delta Commodities Corporation ("Delta"), of Lombard, Illinois. Cantrell explained that when a trader came to Salcedo's office to trade in commodities, Salcedo would telephone the trader's order to Delta, who had "people on the floor" at the Chicago Board of Trade, where the order would be executed.

Anyone wishing to trade in commodities through Salcedo was required to complete an application and sign a risk disclosure statement acknowledging that commodities trading is a "risky venture." The applicant was also required to deposit "margin" funds with Salcedo. Cantrell testified that the market is constantly moving, thus a trader can sustain a financial loss if he buys a commodity that thereafter drops in price. Such losses are entered on the trader's account at the end of each day. If there is a gain, the profit is likewise entered on the account.

At the time appellant opened his account, Salcedo was financially responsible to Delta for all business done through Salcedo. Thus, if a trader at Salcedo sustained losses exceeding the amount of his margin deposit, Salcedo had to stand good to Delta for the deficit. Such a circumstance was characterized as a "debit situation."

After opening his account and making the required margin deposit, appellant began trading through Salcedo. At the close of business on Tuesday, October 12, 1982, Salcedo's records showed appellant's account was in a $3,046.25 debit situation, meaning "that he had used up all of his margin money and had gone beyond that to the extent of $3,046.25." Cantrell tried to contact appellant, but he was out of town.

---

1. The fine was presumably assessed under § 560.011.1(2), RSMo 1978. Appellant does not challenge the amount of the fine.

2. Rule references are to Missouri Rules of Criminal Procedure (14th ed. 1983).

3. Appellant makes the same complaint regarding the denial of his motion for judgment of acquittal at the close of the State's evidence, Rule 27.02(f); however, any error with respect to the denial of that motion was waived when appellant introduced evidence in his own behalf. *State v. Green*, 476 S.W.2d 567, 569[2] (Mo.1972); *State v. Campbell*, 655 S.W.2d 96, 97[1] (Mo.App.1983).

Cantrell discussed the situation with Anderson and Ferrell, and they decided to wait until the next day to see whether they heard from appellant.

The following day, October 13, appellant phoned Cantrell "to check on his position," and Cantrell advised appellant of the debit. Appellant, who was "out of state showing some land," promised to come in on Friday, October 15, and "settle up." Cantrell, Anderson and Ferrell agreed, and appellant was permitted to continue trading through Salcedo on October 13 and 14.

Appellant appeared at Salcedo's office on the morning of October 15. By then, his debit had swollen to $5,760.25. A discussion between appellant and Cantrell resulted in an agreement that appellant could trade through the day, and he would settle up with Salcedo when the day's trading closed.

Appellant "traded quite a bit," but his fortunes continued to decline, and when the market closed appellant was "down $7,642."

Cantrell asked appellant for a check, and appellant wrote one for $10,000 against a checking account he maintained at Scott City Bank & Trust Company under the name "McMikle Real Estate." Appellant dated the check October 15, 1982, made it payable to himself, and wrote "Loan margin" on it. He then endorsed the check on the reverse side and handed it to Cantrell.

Asked why the amount of the check exceeded appellant's debit, Cantrell responded that appellant wanted to continue to trade in commodities through Salcedo, and the excess was for margin.

After appellant departed, Cantrell, Anderson and Ferrell decided to send the check for "direct deposit" instead of waiting for it to clear through normal banking channels. According to Cantrell, the market could go against appellant the following Monday, October 18, which "would put us deeper in debt, so we wanted to know where we stood."

Salcedo had a checking account for Delta at Mercantile Bank in Sikeston. Anderson took the check to Mercantile Bank the afternoon appellant wrote it (October 15), and instructed a teller, Janie Freeman, to "send it for collection and have it paid on sight." Ms. Freeman sent the check to the drawee by registered mail the same day.

On Monday, October 18, 1982, appellant "did some trading" through Salcedo. According to Cantrell, "[W]e thought his account was good." This belief was based on the assumption that the check would be paid upon presentment.

Appellant's check reached Scott City Bank & Trust Company that same day (October 18), and was dishonored, as the balance in the McMikle Real Estate account was only $3,767.57. The balance had been $3,797.23 on October 15, the day the check was written. Scott City Bank & Trust Company marked the check "Insufficient Funds," and returned it to Mercantile Bank by mail.

Ms. Freeman received the check back at Mercantile on Tuesday morning, October 19. She promptly telephoned Salcedo's office and told Cantrell.

While Cantrell was talking to Ms. Freeman, appellant phoned Salcedo's office, and Anderson answered the call. Appellant told Anderson he wanted "to get back in the pork belly trades." Cantrell told Anderson about appellant's check, then cut into the call between appellant and Anderson and told appellant that because of the check, he (Cantrell) would not allow appellant "to put any more positions on."

Salcedo immediately closed appellant's account, resulting in a debit of $7,459. Salcedo paid that sum to Delta, but was unable thereafter to collect from appellant.

Appellant, emphasizing that one of the elements of the crime of passing a bad check is the purpose to defraud, § 570.120.-1, RSMo 1978, argues that the State failed to prove that element. Specifically, appellant says he did not believe he owed Salcedo anything when he wrote the check, and that he handed it to Cantrell for the purpose of being held, not deposited.

Appellant bases this contention on an incident that occurred on Friday, October 8, 1982, when, according to his testimony, he gave Anderson an order to sell five contracts of "pork bellies." Appellant recounted that one of the contracts was sold at $80, and he was advised by Delta, through Salcedo, that the other four were sold at 79.55 each.

Appellant testified he complained to Anderson about the price for the latter four, and Anderson "called Chicago" to find out why all of the contracts did not bring the same price. According to appellant, Anderson was told "it was a fast market." Appellant recalled that Anderson asked for the transaction to be checked again, and it was confirmed three different times that day.

Appellant testified that the following week he received written notification from Delta that the trade of the four contracts of pork bellies on October 8, 1982, at 79.55 each, had been "confirmed in error," and that the four contracts had in fact been sold at 78.55 each. This resulted in a decrease of $1,520 in the value of appellant's account.

According to appellant, when he went to Salcedo's office on October 15, he told Cantrell, Anderson and Ferrell that he (appellant) "felt like Delta was skimming, taking money from us." Appellant testified that according to his records, the balance of his account with Salcedo on the morning of October 15 was "$6,678.75 as a credit, not a debit."

Appellant explained that he traded some commodities that day, and after the market closed he had a "tremendous argument" with Cantrell and Ferrell because they said he owed them some money. Appellant quoted Cantrell as saying that Salcedo was "transferring over" to Heinhold Commodities, a more honest company that "could get direct to the floor." Appellant remembered Cantrell and Ferrell saying that Salcedo was trying to "settle up with Delta" and needed to get their account straightened out. Appellant testified he told Ferrell and Cantrell he would "put up a $10,-000 check for you to hold until such time as you get my account straightened out." Appellant added that along with the $10,-000 check, he gave Cantrell a $1,000 check to open an account with Heinhold.

Anderson and Cantrell confirmed that Delta initially reported the price of the four disputed contracts of pork bellies that appellant sold on October 8 as 79.55. Anderson and Cantrell realized immediately this was an error because the market was not trading in that range when the order was executed. They told appellant they did not believe the report was correct. Anderson testified he called Delta twice, and was told both times that the price was correct. Cantrell recalled Delta saying the order would have to stand until the close of the day.

Anderson testified that on Monday, October 11, he received a call from Delta "that the fill of 79.55 had to be readjusted at 78.55." According to Anderson and Cantrell, appellant came to Salcedo's office that morning (October 11) and they told him of the correction. Appellant thereupon telephoned Delta's president to discuss the matter, and Cantrell attempted to find out who made the mistake. Cantrell explained he never learned who, but it could have been the "pit broker" or the "order desk." Cantrell speculated, "Someone couldn't read someone's writing."

Cantrell, Anderson and Ferrell denied that appellant mentioned the mix-up on October 15, the day the $10,000 check was written, and they each testified that appellant did not ask them to hold that check. They testified further that appellant did not state he wanted an adjustment on his account on October 15.

█ We agree that if appellant indeed handed Cantrell the $10,000 check with the understanding that it would merely be held, and not deposited, the element of purpose to defraud would be lacking, and the conviction could not stand. This hypothesis, however, rests exclusively on appellant's testimony, which was in direct conflict with the testimony of Cantrell, Anderson and Ferrell on that point. The cred-

ibility and weight of testimony are for the jury to determine, and a jury may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case. *State v. Jackson*, 608 S.W.2d 420, 421[1] (Mo.1980). It is not our function to weigh the evidence; we determine only whether there is sufficient evidence from which reasonable persons could have found appellant guilty. *State v. Porter*, 640 S.W.2d 125, 126[2] (Mo.1982).

■ There is abundant evidence to support the State's theory of the case, i.e., that when trading closed on October 15, 1982, appellant was in a $7,642 debit situation with Salcedo, that he wanted to continue trading in the hope of recouping his losses, that as a condition thereof, Salcedo required appellant to pay the debit and deposit additional margin money, that the $10,-000 check was given for that purpose, that appellant realized Salcedo's officers intended to deposit the check and that they expected it to be honored, and that appellant, by reason of the inadequate balance in the checking account, knew the check would not be paid by the drawee. The point is denied.

We next consider appellant's contention that the information fails to charge the crime of passing a bad check. Pertinent to this point, the information alleges:

> "...the defendant, in violation of Section 570.120, RSMo, committed the class D felony of passing bad checks, punishable upon conviction under Sections 558.-011.1(4) and 560.011, RSMo, in that on or about October 15, 1982, in the County of Scott, State of Missouri, the defendant, with purpose to defraud, passed a check in the amount of $10,000.00, drawn upon

The Scott City Bank and Trust Company, Scott City, Missouri, dated October 15, 1982, payable to W.J. McMikle, knowing that it would not be paid."

Appellant's argument, as we understand it, is that the information is deficient because it does not identify the party whom appellant allegedly intended to defraud. Appellant points out that the information merely states he executed a check to himself with the purpose to defraud, but does not disclose the intended victim.

■ Appellant, citing *State v. Eckard*, 655 S.W.2d 596 (Mo.App.1983), reminds us that when a statute defines elements of an offense in generic terms, a defendant is entitled to more than a recitation of the statutory language in the information. In *Eckard*, a prosecution for stealing by deceit, the information was held defective because it failed to state the basic facts which constituted the alleged deceit and therefore did not sufficiently apprise the defendant of the particulars of the offense charged.

Rule 23.01(b)[4] sets out what an information must contain, and Rule 23.01(e) provides that informations substantially consistent with the forms of informations which have been approved by the Supreme Court of Missouri shall be deemed to comply with the requirements of Rule 23.01(b). *See Eckard*, 655 S.W.2d at 597–98.

■ On January 1, 1979, the Supreme Court of Missouri approved MACH–CR 24.-30.1 as a pattern information for the offense of passing a bad check, as proscribed by § 570.120, RSMo 1978. The information under which appellant was prosecuted tracks MACH–CR 24.30.1 in faithful detail. Moreover, Rule 23.02(f) provides:

> "An indictment or information charging an offense of which an intent to

---

**4.** Rule 23.01(b) states:

"The indictment or information shall:

1. State the name of the defendant if known, or if his name is not known, the defendant may be designated by any name or description by which he can be identified with reasonable certainty;

2. State plainly, concisely, and definitely the essential facts constituting the offense charged;

3. State the time and place of the offense charged as definitely as can be done;

4. Cite the section of the statutes alleged to have been violated and the section of the statutes which fixes the penalty or punishment therefor; and

5. State the name and degree, if any, of the offense charged."

injure, cheat, or defraud is a necessary element, may allege that the defendant did an act with such an intent without naming the particular person or persons intended to be injured, cheated, or defrauded."

We therefore reject appellant's attack on the information. If, as he complains, he needed to know the identity of the defrauded party "in order to prepare a defense," he could have moved the trial court for a bill of particulars under Rule 23.04.

We turn now to appellant's contention that his conviction should be reversed because of "prosecutorial vindictiveness." Before trial, appellant moved the trial court to dismiss the information on that ground, or, in the alternative, to "disqualify" the prosecuting attorney (Robert B. Fuchs) and the assistant prosecuting attorney under § 56.110, RSMo 1978, because Fuchs, from and after September 10, 1981, was employed as counsel for a judgment creditor trying to collect a foreign judgment against appellant.

The trial court held a hearing on this motion several days before trial, and denied it. No record of the hearing appears in the transcript. We are, however, able to glean from the motion that the foreign judgment was entered by a court in Tennessee, and that Fuchs was attempting to collect it in Missouri through the available creditors' remedies such as garnishments, executions and contempt proceedings.

Appellant makes no contention that the circumstances from which the foreign judgment arose are connected in any way with those giving rise to the case before us. The foreign judgment was entered prior to September 10, 1981, and appellant's relationship with Salcedo did not begin until a year later. Additionally, the judgment creditor under the foreign judgment is identified in appellant's motion as Ray E. Friedman and Company, Inc., and nothing in the record suggests any connection between that party and Salcedo.[5] We there-fore begin our examination of this point with the assumption that the two cases are factually unrelated.

Appellant argues the prosecutorial vindictiveness issue and the "disqualification" issue together, but they are not identical, and we shall consider them separately.

Prosecutorial vindictiveness as a basis for dismissal of a criminal prosecution is discussed in Matteuzzi, *Prosecutorial Vindictiveness in a Pretrial Setting: Determining the Proper Standard*, 48 Mo.L. Rev. 266 (1983). The concept is difficult to state as a general proposition because of the varied fact situations in which the issue has arisen. It is best illustrated by two of the cases analyzed in the Matteuzzi article. In *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), an accused was charged with, and convicted of, misdemeanor assault in a North Carolina court of limited jurisdiction, and sentenced to six months' imprisonment. He exercised his right of appeal to the trial court of general jurisdiction, where his case would be tried de novo. The prosecutor thereupon obtained an indictment for felonious assault, based on the same act. The accused entered a plea of guilty and received a penitentiary sentence of five to seven years. In affirming the granting of federal habeas corpus relief, the Supreme Court of the United States stated that an accused convicted of an offense is entitled to pursue his statutory right to a trial de novo, without apprehension that the State will retaliate by substituting a more serious charge for the original one. 417 U.S. at 28, 94 S.Ct. at 2103. The Supreme Court held that the initiation of the felony charge denied the accused due process of law. *Id.* at 30–31, at 2104.

A contrary result was reached, however, in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). There, the accused was charged in a Kentucky court with uttering a forged instrument, punishable by 2 to 10 years' imprisonment.

5. Apart from appellant's motion, the only information in the record on appeal about the foreign judgment appears in appellant's trial testi-

mony. The amount of the judgment is $129,-000, and it apparently resulted from appellant's trading in commodities.

During a plea bargaining session, the prosecutor offered to recommend a 5-year sentence if the accused pleaded guilty. The prosecutor warned that if the accused did not plead guilty, he (the prosecutor) would seek an indictment under that state's habitual criminal act, which would subject the accused to a mandatory sentence of life imprisonment, as he had two prior felony convictions. The accused rejected the offer, the prosecutor obtained the habitual criminal indictment, the accused was convicted by a jury, and he received a life sentence. The Supreme Court of the United States, reversing the United States Court of Appeals for the Sixth Circuit,[6] held that the accused was not entitled to federal habeas corpus relief. The Supreme Court stated that punishing a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, 434 U.S. at 363, 98 S.Ct. at 667, but found that in the "give-and-take" of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecutor's offer.

We find no prosecutorial action in appellant's case resembling that in *Blackledge* and *Bordenkircher*. Appellant makes no contention that Fuchs threatened appellant with this prosecution in an effort to compel payment of the foreign judgment, or that Fuchs filed the charge in retaliation for appellant's failure to do so.

■ The evidence summarized *supra* supplied ample grounds for the charge Fuchs filed. Moreover, before filing the felony complaint, Fuchs sent appellant the written notice provided for in § 570.120.3, RSMo 1978. Appellant failed to pay the check within ten days thereafter. That circumstance constituted prima facie evidence of appellant's purpose to defraud and of his knowledge that the check would not be paid. *Id.*

■ Appellant does not argue that Fuchs handled this prosecution any differently than any other criminal case, and the record is barren of any such indication. In sum, there is absolutely nothing, in the record furnished us, to support an inference that Fuchs initiated this prosecution for any reason other than the imposition of a sanction on appellant for the crime he committed. *United States v. Walker*, 514 F.Supp. 294, 311–12[22] (E.D.La.1981). Appellant's complaint about prosecutorial vindictiveness is without merit.

In arguing that the trial court, as an alternative to dismissing the information, should have appointed some other attorney to prosecute this case,[7] appellant relies on § 56.110, RSMo 1978. Appellant argues that Fuchs' employment as counsel for the judgment creditor in the foreign judgment was inconsistent with his duties as prosecuting attorney in the case before us. Appellant fails, however, to explain how such employment was inconsistent with Fuchs' official duties, and appellant cites no case supporting that contention.

■ As noted earlier, the transcript does not contain the hearing on appellant's motion, so we have no means of knowing what, if anything, was presented to the trial court on this issue. We have, however, scrutinized the record supplied us, and have found nothing regarding Fuchs' employment as counsel for the judgment creditor that is inconsistent with his duties as prosecuting attorney. The cases are unconnected except that appellant is a party to both. We see nothing in that, alone, necessitating the appointment of a special prosecutor. The point is denied.

Appellant's next assignment of error concerns the trial court's handling of a motion in limine filed by the State. By that motion, the State sought to exclude evidence regarding certain subjects said by the State to be irrelevant and immaterial.

Appellant's complaint is that the trial court erroneously foreclosed appellant from informing the jury of Salcedo's rea-

---

**6.** *Hayes v. Cowan*, 547 F.2d 42 (6th Cir.1976).

**7.** Fuchs did not appear at appellant's trial. The State was represented by the assistant prosecuting attorney.

sons for terminating its association with Delta and establishing an affiliation with Heinhold Commodities. The frailty in this point is that nowhere in appellant's brief does he tell us what "reasons" he was prevented from presenting. His motion for new trial is similarly uninformative, and we find no offer of proof in the transcript. We are therefore left to ponder what specific evidence appellant wanted to use that was excluded.

Cantrell admitted that on October 15, 1982, Salcedo was in the process of changing its affiliation from Delta to Heinhold, and that Delta had made errors in filling orders.

Appellant testified that he, along with Cantrell, Anderson, Ferrell and another trader, reached a point where they would not put market orders in because they believed Delta was "peeling off a little bit of most all the trades, or we thought they were." Appellant quoted Cantrell as saying that Heinhold was "a more honest company and they wouldn't be skimming."

▇▇▇ What else appellant wanted to present is consigned to speculation. When an objection is sustained to proferred evidence, the party offering the evidence must demonstrate its relevancy and materiality by way of an offer of proof in order to preserve the matter for appellate review. *State v. Dixon*, 655 S.W.2d 547, 557[14] (Mo.App.1983). The offer of proof must state facts which are specific and sufficient in detail to establish the admissibility of the evidence sought to be introduced; mere statements and conclusions of counsel are not sufficient. *Id.* at 557[15]. Without knowing what evidence appellant desired to introduce, and how it was relevant and material to this case, we cannot convict the trial court of error.

Appellant's fifth point attacks the manner in which the verdict was returned. Though the record is not altogether clear, it appears that when the jury returned into court to report its verdict, the jury handed the court a verdict form, bearing the foreman's signature, stating that the jury had found appellant not guilty. It is inferable

that concurrently therewith, the jury handed the court the verdict form finding appellant guilty and assessing his punishment at a fine to be determined by the court; this form, however, was unsigned by the foreman. The court read the not guilty verdict aloud, whereupon the foreman advised the court that it was the wrong verdict, that he (the foreman) had made an error in signing the verdict form.

The jury was sent back to deliberate further, and returned approximately one minute later, handing the court the verdict form finding appellant guilty and assessing his punishment at a fine to be determined by the court. At this point, that verdict form carried the foreman's signature.

The court then inquired, "Is it my understanding that the verdict finding of W.J. McMikle 'Not Guilty' is in error?"

The foreman replied, "Yes, sir, it is."

The court thereupon marked the not guilty verdict form "In Error" and "Void," and preserved it as an exhibit.

The court then asked whether the second verdict form (the guilty verdict) was the verdict of each and every juror. The foreman replied, "Yes."

The court read that verdict form aloud and asked appellant's counsel whether he wanted to poll the jury. Rule 29.01(d). Counsel replied, "Not necessarily." The jury was then discharged.

Appellant voiced no objection as these events unfolded, nor did he request a mistrial. He argues now, however, that the trial court should have declared one. Appellant contends the jury returned inconsistent verdicts, raising doubt that the guilty verdict was the unanimous decision of the jurors. He adds that the not guilty verdict form, having been "received" by the court, terminated the jury's duty.

What occurred in this case is strikingly similar to *State v. Jones*, 583 S.W.2d 561 (Mo.App.1979). There, two counts were submitted to the jury. When the verdict forms were returned, the court read one finding the defendant not guilty of the first

count. The foreman promptly interrupted, explaining that he was nervous and signed both forms. The court then determined that the foreman had signed all four forms. The foreman declared it was his mistake because the jury had found the defendant guilty of both counts. The court instructed the jury to retire and return with the proper forms, and gave them four new ones. The jury returned shortly thereafter with guilty verdicts on both counts. The defendant contended that because two of the original verdict forms had found him not guilty, the trial court's acceptance of the two guilty verdicts constituted double jeopardy. Rejecting this contention, *Jones* held that when a jury returns a patently ambiguous verdict, the trial court has the duty to direct the jury to retire and return with a proper verdict reflecting their true decision. *Id.* at 562[2].

This rule has been applied in other instances where verdicts, as initially returned to the court, were not in proper form. *State v. Adams*, 654 S.W.2d 376 (Mo.App. 1983), verdict ambiguous as to punishment; *State v. Helm*, 624 S.W.2d 513 (Mo.App. 1981), punishment assessed incompatible with finding as to offense.

█ It therefore follows that even if appellant, despite his silence below, can be heard now to challenge the verdict—an issue we need not decide—his attack is unavailing. It was evident to the trial court, as it is to us, that the foreman initially signed a verdict form that did not reflect the jury's decision. The foreman realized his error as soon as the court read that verdict form aloud. The error was swiftly corrected, and none of the jurors, or appellant, questioned the guilty verdict when it was read aloud by the court, and no juror disputed the foreman's confirmation of that verdict as the verdict of each and every juror. In view of appellant's indifference toward polling the jury when tendered that opportunity, his argument here rings hollow. The trial court did not err in rejecting the form that erroneously reported the jury's verdict, or in accepting the form that correctly stated the verdict.

Appellant's final point asserts, without citing authority, that the trial court erred in allowing him to be prosecuted because the effect was to assist the complaining witnesses (presumably Cantrell, Anderson and Ferrell) in collecting moneys appellant allegedly owed them. Appellant does not, however, explain how the prosecution aided Salcedo or its shareholders, and no benefit is apparent to us.

█ Irrespective of that, though, the point is fundamentally unsound. The fact that appellant may have incurred civil liability to Salcedo did not insulate him from criminal prosecution for passing the insufficient funds check. *Donnelly v. Steele*, 180 F.2d 1019 (8th Cir.1950); 22 C.J.S. Criminal Law § 50.

Judgment affirmed.

GREENE, C.J., and HOGAN and PREWITT, JJ., concur.

MAUS, J., not participating.