**STATE of Missouri, Respondent,**

v.

**Leslie JOHNSTUN, a/k/a Leslie Jo Henline, Appellant.**

**No. WD 34461.**

Missouri Court of Appeals, Western District.

May 22, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied July 3, 1984.

Application to Transfer Denied Sept. 11, 1984.

J. Armin Rust, Regional Public Defender (on appeal only), Lexington, for appellant.

John Ashcroft, Atty. Gen., Bruce Farmer, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

PRITCHARD, Presiding Judge.

Appellant was found guilty by the verdict of a jury of armed criminal action under § 571.015, RSMo 1978. Punishment was assessed at five years imprisonment by the jury's verdict, which the trial court imposed.

On August 25, 1982, during the Missouri State Fair in Sedalia, the victim, Wanda Faye Banner, was working in the Consumer Building, also called the Dairy Bar. At 11:00 a.m., break time of about 10 to 15 minutes arrived. Just a little after 11:00, Wanda went to the Varied Industries Building next door and went to the restroom inside it. She saw two ladies, one at a sink and the other leaving, as she entered. All booths were empty, so Wanda went into a middle one. The booths had wooden doors with no locks or latches. As she was in the booth, a lady opened the door, Wanda told her it was being used, but she walked in anyway, closed the door behind her, took off her sunglasses, and took out a gun from a large type knit bag. The gun was a shiny, .38 revolver. The woman said, "I want your money and I want your purse." Wanda told her that she did not have any, that she worked next door at the Consumer's Building and had just gone over there to go to the restroom. Appellant, with the gun still pointed at Wanda, told her to turn the pockets of her jeans inside out and to unbutton her blouse. At that time, an elderly lady came into the restroom and used the sink, and then left. Appellant told Wanda to "Stay in here and don't say anything or tell anyone. Remember, I know where you are", and "I can get you any time", and kept bumping her in the chest with the gun, and then left. Wanda thought that appellant was in the restroom for as long as five minutes.

There was light in the building and a window over appellant. Wanda described appellant's hair as red, blond and dark, and bleached out from the sun. The sunlight was shining right on her, and she was either dark complexioned or had a nice tan. Her eyes were lighter, she was taller than Wanda, and had on a peach or beige dress with a round neck with small straps. Wanda made an in-court identification of appellant, and a dress (State's Exhibit 2); a photograph of appellant showing how she looked at the time of the restroom confrontation; and photographs of a lineup, an issue below addressed.

Wanda reported the incident to a lady, and later gave a description of her assailant to Corporal Gray, of the State Highway Patrol on the Fair Grounds, as a woman, approximately 40 years old, 5'11" to 6' tall, 140 pounds, dark complectioned, light colored eyes, light red hair, wearing sunglasses, and sandals, a peach-colored dress with a white design and cross-straps, and carrying a large, beige, knit purse containing clothing, and a .38 caliber blue steel revolver.

Sergeant John Gordon was on duty at the State Fair on August 25, 1982, and after his lunch at 1:50 p.m., just east of the carnival midway, he noticed a Miss Henline a short distance away who fit the earlier broadcast of a person who was wanted for an attempted armed robbery. He overtook her and asked her to identify herself, and she told him her name was Leslie Henline. She had no identification credentials, and Gordon asked her to go to the patrol headquarters. She had on a sun-dress, peach or light brown color, with small printed flowers on it. State's Exhibit 2, a waist-up photograph of appellant, was taken the day she was arrested. Gordon talked to the

victim, but she and appellant were not allowed to see each other at the time.

As a part of appellant's case, Michael Keith McKinney was called as a witness. He testified that he was appellant's fiance. He was working at the State Fair in Sedalia on August 25, 1982, arriving there on August 20th, and "worked all the way through except for when I was in jail and stuff like that over this case." On August 25, he awakened at 10:10 a.m., having overslept. He put away the sleeping gear and went out on the Midway to help open up tents, but his "joint" was open so he walked down to appellant's to help open hers, but she had done it on her own. He got down to where she worked 11 to 13 minutes after 10:00. He then went to buy her a dress, apparently the one she was wearing at the time she was arrested. When he took the dress back to appellant, she was ready to take a shower, so he walked her to the shower room at about 10:25 or 10:30 a.m. He saw her back at his "joint" about 30 minutes later wearing the new dress. Appellant went to see her boss about getting some money, returning in about 5 minutes. McKinney testified that the time was then 11:00, after which the two went for breakfast at a restaurant, taking 5 minutes to walk there. They were at the restaurant for a little over an hour, eating and taking a break. Then the two walked back to McKinney's joint, after which she left to go to the restroom. He did not see appellant any more that day until after he went up to the police station in response to a lady telling him that he had to report or give a call to the police.

On cross-examination, McKinney acknowledged that he had a conversation with Corporal T.L. Gray on August 25, 1982, and that he was then asked these questions and gave these responses: "QUESTION: 'What time did she get back from the shower?' ANSWER: 'She was back on the Midway at 12:30 p.m.' QUESTION: 'You saw her when you got back to the Midway?' ANSWER: 'Yes, But it could have been 11:30 a.m.'" McKinney reaffirmed that at 11:15 a.m., on August 25, 1982, he was sitting at the Blackbird

Restaurant eating breakfast, and that he had walked appellant to the shower that morning.

On re-direct examination, McKinney testified that it was not correct that he told Corporal Gray that he next saw appellant back on the Midway at 12:00 to 12:30 p.m., or that it could have been 11:30 a.m.—the true time was about 10:55. He made those misstatements to Gray due to the pressure he was under. He reiterated that it was 11:00 a.m. when the two went to breakfast.

■ By her first point appellant contends that it was error to permit the state to impeach her alibi witness, Michael McKinney, by use of his prior statement given to Corporal Gray because that statement was not disclosed to appellant.

The state made this request for disclosure from appellant: "5. If the defendant intends to rely on the defense of alibi and the state in its request specifies the place, date and time of the crime charged, disclosure shall be in the form of a written statement by counsel for the defendant, announcing such intent and giving specific information as to the place at which the defendant claims to have been at the time of the alleged offense, and, as particularly as is known, the names and addresses of the witnesses by whom he proposes to establish such alibi."

The appellant made response to the state's request, stating that she intended to call Michael McKinney as a witness, and "5. Defendant *may* rely on the defense of alibi, but Defendant has not with particularity been advised of the time and place of the alleged offense and thus cannot give specific information concerning her defense." (Italics added.) In this connection, see *State v. Cox*, 542 S.W.2d 40, 50[12–15] (Mo.App.1976), holding that an equivocal declaration that a defendant "may" assert the defense of alibi is not within the spirit or letter of the Rule. "The Rule contemplates that the defendant be specific as to whether he will or will not assert the defense of alibi. It does not permit equivocation."

Appellant also made a request for disclosure from the state which included the names and last known addresses of persons whom the state intended to call as witnesses, together with their written or recorded statements. Although not in the original legal file, a supplemental legal file shows that memoranda of statements of witnesses was attached and incorporated by reference. The report of Sgt. J.S. Gordon (listed as a witness) was attached, showing that the offense occurred at 11:15 a.m. on 8–25–82 at the carnival grounds at the Mo. State Fair. His statement, attached, recites that Wanda Faye Banner reported at 11:22 a.m. on the same day that a few minutes earlier, she had been the victim of an attempted armed robbery. Of course, the report and the statement gave to appellant information about the time and place of the offense, and it was not necessary for the state to elaborate further in its responses, especially in view of the fact that appellant did not *unequivocally* state in her own responses that she intended to rely upon the defense of alibi.

Inasmuch as the state had, by furnishing statements of witnesses to appellant in compliance with Rule 25.03, which disclosure revealed the time and place of the crime charged to her, if she really intended to rely upon the defense of alibi, it was her reciprocal duty of disclosure under Rule 25.05(A)(5) unequivocally to announce that intent, and further to give specific information as to the place at which she claimed to have been at the time of the alleged offense, and, as particularly as is known, the names and addresses of the witnesses by whom she proposed to establish such alibi. As noted, the state requested that disclosure but appellant did not comply. Yet she sought to prove by Michael McKinney her whereabouts away from the scene of the alleged offense and during its commission. In this situation, the trial court, in its discretion, could have excluded McKinney's testimony, *State v. Haslip*, 583 S.W.2d 225, 229[13–14] (Mo.App.1979), upon proper objection, but no objection was made, hence the testimony came in.

What the state has done here is to use McKinney's prior inconsistent statement to impeach him after he injected testimony tending to establish the defense of alibi. What appellant seems to be arguing is that the state was required to divulge the existence of the prior statement as something akin to the disclosure of a rebuttal witness, but the argument is untenable because the state had no specific prior knowledge that appellant would attempt to establish an alibi at trial. Had there been a specific disclosure of that defense, then the case might be in a different posture, as requiring a reciprocal disclosure of the statement under *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). (That case merely holds that where Oregon had no provision for reciprocal discovery, the Due Process Clause of the 14th Amendment forebade enforcement of an alibi preclusion rule against petitioner.) Note also *State v. Curtis*, 544 S.W.2d 580, 582 (Mo. banc 1976), holding that where the defendant has given notice-of-mental disease or defect defense, the state, under Wardius, must disclose the names and addresses of witnesses of rebuttal witness to that defense (as well as an alibi defense). None of these cases, nor appellant's cited cases of *People v. Fields*, 12 Ill.App.3d 608, 298 N.E.2d 743 (1973); and *Stevens v. State*, 582 P.2d 621 (Alaska 1978), are helpful to her. In Fields, the defendant disclosed his alibi defense, under which fact it was held reversible error for the state not to disclose a subsequently taken statement from the alibi witness. In Stevens, apparently there was a disclosure of the alibi defense, but the reversal was premised upon the failure of the prosecution to disclose police reports used to impeach alibi witnesses, where ordered to do so by the court, and in contravention of the Alaska discovery rule.

On the facts of this case, *State v. Mitchell*, 622 S.W.2d 791 (Mo.App.1981), is helpful to the state's position that the trial court did not improperly permit the use of McKinney's prior statement, where he testified to the alibi defense at trial. In Mitchell, the appellant put the issue of his alibi in question. A defense investigator, Schmitz,

went to Grandpa Pidgeon's (apparently a restaurant) to investigate appellant's alibi, where appellant testified he was on the date of the homicide on March 4. Schmitz denied on cross-examination that he ever asked rebuttal witness, Ms. Nelson, who was employed by Grandpa Pidgeon's, if he asked her to identify appellant as being thereon the day of the murder. Ms. Nelson then presented her testimony that Schmitz had shown her a picture of appellant and asked her if she had seen him on the date in question. The court held that the testimony was offered to impeach Schmitz, not to rebut the alibi. Appellant here testified as to her whereabouts other than at the scene of the offense and at the time thereof. Absent a proper tender of the alibi defense, discussed above, the cross-examination of witness McKinney went but to the issue of his credibility as a witness. Point I is overruled.

■ By Point II, appellant contends that the trial court erred in denying her motion to suppress pre-trial-identification (lineup) and in-court identification. She says that the procedures used by the State Highway Patrol caused the lineup to be impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification, in that she was the only person in the lineup who wore a print dress, and she was forced to stand therein in the dress she wore when she was arrested "and all of the women in the lineup fit defendant's description and none of them resembled the description Wanda Banner originally gave." The state counters that there was no timely objection to the identification testimony at trial, and therefore the point is not preserved for review. That is true, but nonetheless, the contention will be reviewed to see if plain error was committed in admitting the evidence.

As to appellant's assertion that the lineup was impermissibly suggestive because she stood therein in the same dress she wore when arrested, these analogous cases demonstrate that this fact does not require suppression of the identification evidence: *State v. Gormon*, 584 S.W.2d 420, 424[8]

(Mo.App.1979), where the assailant was wearing tennis shoes at the time of the crime, and was the only one in the lineup wearing tennis shoes, and the prosecutrix testified as to other physical characteristics; *State v. Abrams*, 597 S.W.2d 230, 232[5–7] (Mo.App.1980), where the assailant was described to police as a short, black man, wearing a white T-shirt, and he appeared in the lineup as the only person matching the description and wearing the T-shirt. A rosary belonging to the victim was found in defendant's car and also a hammer used in the assault. There was an independent basis for identification by a witness who saw defendant pass by his truck at the scene; see also, *State v .Terry*, 582 S.W.2d 337, 340[5] (Mo.App.1979); and *State v. Arnold*, 528 S.W.2d 164, 166[3] (Mo.App.1975). Here, Wanda Banner testified as to other characteristics of the woman who pointed the gun at her: dark, curly hair with red, blond streaks, dark complexion, and gave her height and weight. She immediately identified appellant upon seeing the lineup of five women.

■ Assuming that there was some element of suggestiveness in the lineup identification, there are other standards by which the identification procedures are measured: an examination of the totality of the circumstances to see if there was impermissible suggestiveness, *State v. Grady*, 649 S.W.2d 240, 244[8, 9] (Mo.App. 1983), and the reliability of the identification testimony, as for instance, whether there was an independent basis for the identification. *State v. Higgins*, 592 S.W.2d 151, 160[13, 14] (Mo. banc 1979), sets forth these factors to be considered for assessment of the reliability standard which are here related to the evidence by the use of parentheses: (1) The opportunity of the witness to view the criminal at the time of the crime. (Wanda was confronted by appellant in the restroom stall for about five minutes, at close range and in sunlight from a window which was shining directly on her); (2) The witness' degree of attention (Wanda was looking directly at appellant who was pointing and bumping the

gun at her); (3) The accuracy of the witness' prior description (Wanda described appellant sufficiently for the patrolman readily to match it upon her apprehension); (4) The level of certainty demonstrated by the witness at the confrontation (Wanda immediately picked out appellant as being her assailant upon seeing the lineup); and (5) The length of time between the crime and the confrontation (here it was but six hours, hardly enough to destroy reliability. See the *Higgins* case, supra, where the length of time was one week, held not to be an unreasonable length of time.).

■ Appellant makes one other attack upon the lineup procedures as being impermissibly suggestive. Four municipal women employees were placed in the lineup with appellant, who was the only one wearing a peach-colored floral print dress, which appellant says fit Wanda's description exactly. She says that none of the women remotely resembled the description which Wanda had given earlier. The photograph of the lineup has been deposited with this court. It shows that at least two of the persons have dark hair styles similar to that of appellant. The dress style of appellant is, of course, different from the other women, it being similar to that described by Wanda and worn by appellant at the time of her arrest. In *State v. Kirk*, 636 S.W.2d 952, 954[5, 6] (Mo.1982), it was held, "A lineup does not require exact physical conformity of participants, including height. *State v. Proctor*, 535 S.W.2d 141, 143 (Mo.App.1976)." The composition of the lineup was not impermissibly suggestive, and the matter of the same dress therein as at the time of arrest is above addressed as per the Higgins case criteria, supra, to show reliability of the identification as having an independent basis. Although Wanda had taken a phenobarbital pill (for epilepsy) prior to the lineup, there is no evidentiary showing that it affected her ability to make an identification at that time. Point II is overruled.

■ After deliberating, the jury returned into open court two verdicts, each signed by its foreman: "We, the jury, find the defendant, Leslie Jo Henline, guilty of Armed Criminal Action, as submitted in Instruction No. 5. We assess and declare the punishment at five yrs (5) years.", and "We, the jury, find Leslie Jo Henline not guilty." The court informed the jury that the instructions told it to use one verdict form and return the other unused with the rest of the forms, and directed it to return to the jury room and read the instructions on the point and return to the court only one verdict, and "You have returned me two verdicts and I can't accept but one." The court provided the jury with new forms, and four minutes after retiring, it returned only one signed verdict finding appellant guilty of armed criminal action. Counsel had moved the court to accept the not guilty verdict or alternatively to declare a mistrial, which were overruled. There was but one single charge submitted -armed criminal action. The two verdicts were absolutely inconsistent, and the court could not possibly have construed them to arrive at the intention of the parties under the rule of *State v. Barron*, 465 S.W.2d 523, 529[12, 13] (Mo.1971). In 76 Am. Jur.2d Trial, § 1155, p. 123, it is said, "It has been held that where the jury returns two verdict forms, one showing a verdict of guilty and the other a verdict of not guilty, it is proper for the court to treat the forms returned as showing but one verdict and to submit new forms to the jury and to return them to the juryroom to correct the inconsistency in the forms returned and authenticate their true verdict." That procedure was followed in the there cited case of *People v. Mesta*, 253 Cal.App.2d 780, 61 Cal.Rptr. 731, 734, et seq. (1967), and held to be proper. Obviously, the two inconsistent verdicts were the result of a clerical error and confusion of the jury, which the trial court properly undertook to have the jury correct under the foregoing authority. Although appellant here suggests that the trial court should have, upon its own motion, polled the jury as to the two inconsistent verdicts to resolve any doubts, under Rule 29.01, it is doubtful that a poll of the jury would have resolved the inconsistency, and it was the better to have the jury to

retire in private to return its true verdict, which was done. No prejudice to appellant is apparent because of the use of this procedure, and Point III, raising the issue, is overruled.

The judgment is affirmed.

All concur.