**STATE of Missouri, Respondent,**

**v.**

**Billy Wayne POE, Appellant.**

**No. 13998.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 11, 1986.

Motion for Rehearing or Transfer to Supreme Court Denied April 2, 1986.

Application to Transfer Denied
May 13, 1986.

---

Mark V. Clark, Columbia, David Robards, Joplin, for appellant.

William L. Webster, Atty. Gen., Victorine R. Mahon, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

AFFIRMED

Billy Wayne Poe ("appellant"), tried as a prior offender, § 558.016.2, RSMo Cum. Supp.1983, and as a persistent offender, § 558.016.3, RSMo Cum.Supp.1983, was found guilty by a jury of forcible rape, § 566.030.1, RSMo Cum.Supp.1983, and sentenced by the trial court to 20 years' imprisonment.

Appellant maintains the trial court erred in (a) disallowing evidence of the victim's "prior sexual conduct," (b) denying appellant's motion to compel the victim to answer certain questions propounded to her on deposition, (c) failing to furnish appellant a transcript of the testimony of the victim's employer at a previous trial, and (d) accepting the verdict of guilty after the jury had earlier returned "inconsistent verdicts of guilty and not guilty."

Inasmuch as appellant does not challenge the sufficiency of the evidence to support the verdict, we summarize only such testimony as is necessary to rule the assignments of error.

The victim, age 21 at time of trial,[1] testified that on Thursday, January 12, 1984, she was separated from her husband, and was residing with the younger of her two children, a boy 11 months of age, in an apartment in Joplin. The victim was employed as a "car hop" at a drive-in during the day, and as a waitress at a restaurant at night.

On the afternoon of January 12, appellant appeared at the drive-in and requested the victim, who was on duty, to ask another female employee where the latter's brother could be found. The employee came outside and engaged in conversation with appellant. The victim overheard appellant mention a job on a boat paying $95 per day, so the victim asked appellant if there was any other opening. Appellant responded that a cook was needed.

The victim discussed the job briefly with appellant and looked at some papers and pictures he displayed. She then arranged to meet him at Denny's restaurant after work to discuss matters further.

Later that afternoon they met as planned, and discussed "how things would go on the boat." According to the victim, she was somewhat skeptical, as jobs paying

---

1. Trial occurred October 5, 1984.

$95 per day are "something you just wouldn't hear every day."

During their conversation, appellant handed the victim a check for $400 on appellant's personal account. According to the victim, appellant explained that the check was an advance on her pay so she could pay off her bills and get additional clothing. The victim testified that she had plans for the evening, as did appellant, so they decided to meet at her apartment later that night for further discussion.

The victim recounted that she spent the evening "out riding around with some friends," and that she returned to her apartment "probably around 11:00 or so."

Appellant thereafter appeared at the victim's apartment, and they talked " '[t]il about 1:00 or 2:00 in the morning." During the conversation, appellant drank a beer or two, and the victim had "half a glass of wine."

Suddenly, according to the victim, appellant "had a knife at my throat." He asked the victim whether anyone besides her and her baby were in the apartment. The victim said no, but appellant made her go through the apartment and show him. While in a bedroom, appellant directed the victim to pick up a blanket. They returned to the living room, and appellant told the victim to put the blanket on the floor.

Then, according to the victim, appellant said, "You're a very pretty lady," and, "Well, I'd really like to f__ you." Appellant thereupon ordered the victim to remove her clothing, which she did, and appellant removed his. Appellant then had sexual intercourse with the victim.

At some point, appellant ceased intercourse and ordered the victim to turn over on her stomach, as he wanted to commit anal sodomy on her. The victim testified: "I was crying, I kept begging with him, you know, not to do it. So finally, I guess, after I pleaded with him long enough, he decided not to." Appellant did, however, resume sexual intercourse with the victim.

Afterward, appellant permitted the victim to put her clothing on, and he said he was sorry for what he had done. The victim told appellant he should take his check back because she was not going to work for him. According to the victim, appellant told her to keep the check and get her baby something.

At this point, appellant was still displaying his knife, and he said he did not know what he should do or whether he should kill the victim so she could not tell the police. The victim testified she assured appellant she would not call the police.

Appellant ultimately departed about 7:00 a.m.

The victim went to work at the drive-in at midmorning. Her employer noticed that she was upset, so he asked what the problem was. The victim initially refused to tell him, but when he inquired again after lunch, the victim "broke down" and revealed what had occurred. When the victim mentioned the check, her employer pointed out that this provided a means of identifying appellant. The employer reported the matter to the police, and the victim thereafter went to the police station.

The victim never attempted to cash the check.

Appellant, age 39 at time of trial, testified he worked as a pilot and as an engineer on towboats on "various rivers." He had been in Joplin only a few days before going to the drive-in on January 12. Appellant's version of the events at the drive-in paralleled the victim's.

Appellant testified that when he and the victim met later that afternoon at Denny's, the victim explained that she was separated from her husband and was having financial difficulties. According to appellant, he assured the victim that he would do the best he could "to get her a job on the boat."

Appellant testified that because of the victim's financial condition, he "agreed to give her the check for a date that night." Appellant quoted the victim as saying that she already had a date with a man who "had helped her financially through some hard times," and that she could not break that date. Because of that, it was agreed

that the victim would meet appellant at the victim's apartment between 11:30 and 12:00.

Appellant went to the apartment as planned, and discussed the cook's job with the victim in greater detail. According to appellant, the victim agreed to take the job if appellant could arrange it.

Appellant admitted having sexual intercourse with the victim, but denied using force. According to appellant, the victim consented because of the $400 check plus his promise to get her the job. Appellant denied brandishing a knife, explaining that he did not have one.

Appellant testified that the check was "no good." He also admitted that he never had any intention of getting the victim a job.

Appellant's first assignment of error is that the trial court wrongly denied his motion to admit evidence of the victim's prior sexual conduct. Appellant insists that he had the right under § 491.015.1(3), RSMo 1978,[2] to present such proof, as it constituted evidence of the "immediate surrounding circumstances of the alleged crime." Emphasizing that consent was the pivotal issue, appellant argues that he should have had an opportunity, in the presence of the jury, to question the victim about whether she had previously engaged in sexual conduct with other men in exchange for mon-

ey. Appellant theorizes that if he had been allowed that opportunity, he could have established that the victim "had a prior record of having sex with men for money." This, according to appellant, would have demonstrated that the victim accepted the $400 check from appellant in exchange for sex, thus proving that she consented to the sexual act with him.

Appellant's contentions require study of certain procedural occurrences in the trial court.

Trial was originally scheduled for June 4, 1984, but was rescheduled for June 18 due to a delay in appellant's receiving discovery. Later, because of a number of motions which had to be heard before trial, the June 18 setting was cancelled, and trial was rescheduled for July 19.

On July 17, two days before trial was set to commence, defense counsel[3] took the victim's deposition. Defense counsel asked the victim whether she was familiar with a man named Jason Wheeler or a man named Leland Beezley. The victim answered, "No."

Defense counsel also asked the victim whether she had ever engaged in any kind of sexual acts for money or compensation of any kind within 30 days of the alleged rape. The victim answered, "No."

Defense counsel then asked the victim whether she had ever engaged in any sexu-

---

2. Section 491.015, RSMo 1978, provides, in pertinent part:

"1. In prosecutions for ... rape, ... opinion and reputation evidence of the complaining witness' prior sexual conduct is inadmissible; evidence of specific instances of the complaining witness' prior sexual conduct or the absence of such instances or conduct is inadmissible, except where such specific instances are:

. . . . .

(3) Evidence of immediate surrounding circumstances of the alleged crime; ...

. . .

2. Evidence of the sexual conduct of the complaining witness offered under this section is admissible to the extent that the court finds the evidence relevant to a material fact or issue.

3. If the defendant proposes to offer evidence of the sexual conduct of the complaining witness under this section, he shall file with the court a written motion accompanied by an offer of proof or make an offer of proof on the

record outside the hearing of the jury. The court shall hold an in camera hearing to determine the sufficiency of the offer of proof and may at that hearing hear evidence if the court deems it necessary to determine the sufficiency of the offer of proof. If the court finds any of the evidence offered admissible under this section the court shall make an order stating the scope of the evidence which may be introduced. Objections to any decision of the court under this section may be made by either the prosecution or the defendant in the manner provided by law. The in camera hearing shall be recorded and the court shall set forth its reasons for its ruling. The record of the in camera hearing shall be sealed for delivery to the parties and to the appellate court in the event of an appeal or other post trial proceeding."

3. The attorneys now representing appellant did not represent him in the trial court.

al acts for money or any type of compensation within 60 days prior to the alleged rape. The victim answered, "No, sir."

Defense counsel thereupon asked the same question "with regard to ninety days prior." The victim responded, "I prefer not to answer."

On the same date the deposition was taken, appellant filed a written motion for continuance, alleging that he needed time to locate and subpoena Jason Wheeler and Leland Beezley, who were "employees of barges which travel up and down the river." Although the record is sketchy, it is inferable that appellant represented to the trial court that he expected Wheeler and Beezley to testify, respectively, that each had, on some unspecified occasion, engaged in sexual intercourse with the victim and had paid her for the privilege.

On July 19, 1984, the cause came on for trial as scheduled. The motion for continuance was denied and the cause was tried, resulting in a verdict of guilty. Neither Wheeler nor Beezley appeared as a witness.

On August 16, 1984, appellant's motion for new trial was granted because of a defect in the information. Retrial was set for September 7, 1984.

On August 29, 1984, nine days before the scheduled retrial, appellant moved for a continuance, stating that Wheeler was scheduled to get off a boat on September 9, and that appellant wanted to call Wheeler as a witness "to testify about what he says are his past sexual experiences with this complaining witness." The trial court granted the continuance, rescheduling the trial for October 5, 1984.

The cause was tried as scheduled on October 5. The docket sheet reflects that appellant, prior to voir dire, filed a "motion to admit evidence of prior sexual conduct of the complaining witness." We have searched the record on appeal, but have failed to find any such motion. We have found, however, in the transcript, a statement by defense counsel that he did not desire an immediate ruling on the motion, but did want "a ruling on it at a later point in order to be sure I've made a record on the issue."

A jury was selected and sworn, and the trial court gave the initial instructions (MAI–CR 2d 1.06 [1983 Revision], 2.01, and 2.02).

Prior to the State's opening statement, defense counsel requested a hearing on his motion "under the rape shield law." The trial court thereupon conducted a hearing outside the presence of the jury. At that hearing, defense counsel endeavored to make an "offer of proof" through the testimony of the victim by asking her whether, on January 12 or 13, she had engaged in any type of sexual acts for any type of remuneration. The victim answered, "No."

Defense counsel then asked the victim whether, on January 12 or 13, she had the use of an automobile "in return for any type of sexual consideration." The prosecutor objected that the question violated "the rape shield law."

The trial court observed that for several months, appellant had maintained that he needed time to subpoena two witnesses "who would testify that they had been up here to Joplin, had had sexual intercourse with this young woman for hire, that they had given [appellant] her name and referred him to her, that he came up here and contacted her for the same purpose." The trial court pointed out that the case had been delayed for two or three months and that there had been no sign that any such witnesses existed. The trial court stated that if such witnesses had been produced, the court would have held a hearing and permitted appellant to make an offer of proof as to what such witnesses would testify to, and would have then decided whether such testimony was admissible. However, said the trial court, it appeared that appellant was now attempting, through questioning the victim, to supply evidence that did not exist.

The trial court nonetheless allowed defense counsel to ask the victim, during the in camera hearing, if she had had sex with anyone for hire within 30 days preceding

the alleged rape. The victim testified she had not. The trial court then ruled that defense counsel could not, in the presence of the jury, question the victim about any sexual activity other than the act involved in the instant case.

Appellant now tells us that if the trial court had permitted defense counsel to question the victim, in the presence of the jury, about her prior sexual conduct, the victim's testimony "would have shown that the victim had had a systematic pattern of voluntarily consenting to sex with men in exchange for money." Appellant says that such conduct constituted "evidence of immediate surrounding circumstances of the alleged crime," and was consequently admissible under § 491.015.1(3), RSMo 1978.[4]

■ The first flaw in appellant's contention is that if an accused, in a rape prosecution, desires to offer evidence of the sexual conduct of the alleged victim, the accused is required by § 491.015.3, RSMo 1978, to file a written motion accompanied by an offer of proof or make an offer of proof on the record outside the hearing of the jury. The record furnished us fails to include any such motion, and, during oral argument before us, counsel for both sides agreed that appellant failed to comply with that provision.

In *State v. Hassler*, 690 S.W.2d 178 (Mo. App.1985), a statutory rape case, the accused argued on appeal that the trial court had erred in barring him from introducing evidence of the prosecutrix's prior sexual activities. The opinion stated that one of the reasons such evidence was inadmissible was that the accused had neglected to file the written motion required by § 491.015.3, RSMo 1978. *Id.* at 180.

In *State v. Salkil*, 659 S.W.2d 330 (Mo. App.1983), a forcible rape case, the accused argued on appeal that the trial court had erred in barring him from attempting to prove that on two occasions prior to the incident in question, the prosecutrix had voluntarily engaged in sexual relations with a man other than her husband. The opinion stated that such evidence was inadmissible because, among other reasons, the accused neglected to file the written motion required by § 491.015.3, RSMo 1978. The trial court's refusal of the evidence on that ground was upheld. *Id.* at 333–34[10].

Inasmuch as the record of the proceedings in the trial court in the instant case fails to include a written motion by appellant complying with § 491.015.3, RSMo 1978, we hold that appellant is foreclosed from complaining on appeal that the trial court erred in refusing to allow him to question the victim in open court about her prior sexual conduct.

■ Furthermore, there is no showing in the record before us that such questioning would have elicited any testimony from the victim about prior sexual conduct that would have been admissible as evidence of immediate surrounding circumstances of the alleged crime under § 491.015.1(3), RSMo 1978, the provision relied on by appellant. The victim and appellant had never met prior to January 12, 1984, and the victim, during her deposition, disavowed any sexual conduct with anyone for remuneration within 60 days preceding the alleged rape. During appellant's offer of proof at trial, the victim denied any such conduct for remuneration within 30 days preceding the alleged rape.

■ Section 491.015, RSMo 1978, creates a presumption that evidence of a rape victim's prior sexual conduct is irrelevant. *State v. Brown*, 636 S.W.2d 929, 933[1] (Mo. banc 1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 448 (1983). Given the posture of the record in the instant case and the absence of any hint by appellant as to what specific sexual conduct his questioning of the victim in the presence of the jury would have established, we cannot speculate that such questioning would have adduced any testimony qualifying for admissibility under § 491.015.1(3), RSMo 1978. Appellant's first assignment of error is, accordingly, denied.

**4.** Footnote 2, *supra.*

██ The next assignment of error we consider is appellant's point 4, which asserts that the trial court erred in denying his motion to compel the victim to answer certain questions she had declined to answer during her deposition. This assignment of error, like appellant's first point, requires a review of what occurred below.

On September 28, 1984, 73 days after the victim's deposition had been taken and seven days prior to retrial, appellant filed a written motion praying the trial court to direct the victim to answer eight deposition questions. The first of those concerned a 1970 Firebird automobile registered in the name of the victim's "boyfriend," which the victim had testified she was buying. Defense counsel had asked the victim whether she was paying for the vehicle or had paid for it. The prosecutor had objected on grounds of relevancy, and the victim had stated she preferred not to answer.

Defense counsel had also asked the victim what kind of automobile she had before the Firebird. When the prosecutor objected, the victim had likewise declined to answer that question.

Defense counsel had asked the victim whether she had told appellant she had been raped on a previous occasion. The prosecutor had objected, and the victim had declined to answer.

On the day the victim encountered appellant at the drive-in (January 12, 1984), the victim was driving a "Saab Sonet." Defense counsel had asked the victim who owned that vehicle. Upon the prosecutor's objection, the victim had declined to answer.

The other four questions listed in appellant's motion concerned the subject of whether the victim had engaged in sexual acts for compensation. As explained earlier, the victim testified on deposition that she had not done so within 30 days of the alleged rape or within 60 days prior to the alleged rape. Thus, only two of the four inquiries about sexual conduct were unanswered. One was whether the victim had *ever* engaged in any kind of sexual act for compensation, and the other was whether

she had done so within 90 days prior to the alleged rape.

On October 1, 1984, four days before retrial, the trial court denied appellant's motion to compel answers.

Appellant maintains he needed to know how the victim "was paying for her expensive sports car" in order to obtain information establishing that she "possibly was receiving money in exchange for sex to supplement her low-paying regular job to be able to support her expensive sports car and her child." Appellant argues that the trial court's ruling denied him evidence which could have shown that the victim consented to sex with him in exchange for money.

The only automobile the victim testified she was buying was her boyfriend's 14-year-old Firebird, so we assume that vehicle is the "expensive sports car" to which appellant is referring. As noted earlier, the victim refused to say whether she was paying for the vehicle or whether she had already paid for it. We fail to see how an answer to that inquiry would have been admissible at trial on the issue of consent, or how it could have reasonably led to the discovery of admissible evidence on that issue. The victim testified unequivocally on deposition that she had not engaged in any sexual acts for compensation within 30 days of the alleged rape, nor had she engaged in any sexual acts for compensation within 60 days prior to the alleged rape. There was not a scintilla of evidence to the contrary. Even if the victim's relationship with her boyfriend included sexual intimacies—and there is no evidence that it did— we fail to see how that would have constituted evidence of immediate surrounding circumstances of the alleged crime under § 491.015.1(3), RSMo 1978, particularly in view of the victim's disclosure in her deposition that on January 12, 1984, her boyfriend was in Guam. Consequently, whether the victim had paid for her boyfriend's Firebird, or whether she was in the process of paying for it, could not have been relevant to any issue, nor could it have reason-

ably led to the discovery of admissible evidence on any issue.

The same is true regarding the inquiry about the automobile the victim had before the Firebird. There was no showing of how long the victim had had the Firebird, and consequently no indication as to when she had had the vehicle that preceded it. In such circumstances, evidence as to what type vehicle the latter was could not have been relevant to the immediate surrounding circumstances of the alleged crime under § 491.015.1(3), RSMo 1978.

Appellant fails to explain how an answer to the question whether the victim had told appellant she had been raped on a previous occasion, and how an answer to the question as to who owned the Saab Sonet, would have been admissible at trial or would have been reasonably calculated to lead to the discovery of admissible evidence. Absent such showing, we cannot convict the trial court of error in refusing to compel the victim to answer those questions.

We likewise find no error in the trial court's refusal to order the victim to answer the question whether she had *ever* engaged in sexual acts for compensation, or to answer the question whether she had engaged in such acts for compensation within 90 days prior to the alleged rape. When the trial court denied appellant's motion to compel answers, the trial court had before it the victim's deposition containing her sworn denial that she had engaged in any such acts for compensation within 60 days prior to the alleged rape. We fail to see how any such conduct more than 60 days prior to the alleged rape could have constituted evidence of immediate surrounding circumstances of the alleged crime under § 491.015.1(3), RSMo 1978. We likewise fail to see how such conduct could have reasonably led to the discovery of evidence that would have been admissible under that provision. We therefore find no merit in appellant's point 4.

■ Appellant's point 3 assigns error in the trial court's alleged failure to provide appellant a free transcript of the first trial.

Appellant says he was prejudiced by this in that he was unable, at retrial, to impeach the testimony of the victim's employer. This complaint, as did the previous ones, necessitates a procedural synopsis.

On August 23, 1984, a week after the trial court had set aside the verdict in the first trial and ordered a new trial, defense counsel (an assistant public defender) filed a written motion for a transcript of the first trial, alleging it was needed for "trial preparation and impeachment of witnesses," and that appellant was without funds to obtain it.

On August 29, 1984, the motion was heard by the trial court. The prosecutor announced that he had already obtained from the court reporter a transcript of appellant's testimony at the first trial, and that he (the prosecutor) would supply a copy to defense counsel without cost. Defense counsel then narrowed his request to a transcript of the testimony of the victim and her employer, the only persons other than appellant who had testified at the first trial.

The trial court thereupon entered the following order:

"Defendant's motion for transcript is sustained and Court orders defendant furnished a copy of that portion obtained by the State without charge, and the public defender fund to pay for the balance of the testimony with a copy to the State."

Defense counsel then asked whether the court's order obligated appellant to order the balance of the testimony, or whether the order simply gave appellant the option. The trial court responded that if defense counsel and appellant decided they did not need the transcript, the court was not going to direct defense counsel to furnish a copy to the State if defense counsel did not obtain one for his own use. Defense counsel thanked the court and proceeded to take up another motion.

At the retrial, defense counsel, during cross-examination of the victim's employer, inquired about the latter's observations of

the victim when she reported for work on the morning of January 13, 1984:

"Q  Was your first impression that she might have been in some kind of financial difficulty?

A  I can't ... I really ... no, I didn't think of any financial problem.  I really didn't.

Q  It didn't cross your mind at first that that might be why she was upset, or at some point until you found out what it was?

A  No, I really can't say because, you know, I just seen her upset and I just wanted to know what the problem was. I thought maybe she had a problem with one of the help down at the store. I've got 15 employees down there with each one of them with a different personality, and, you know, people working with each other, it's tough.  So that's what I thought the problem was. [DEFENSE COUNSEL]: All right. Thank you."

The employer was excused without further questioning, and the State rested its case.

At that point, defense counsel asked the trial court at sidebar whether the court reporter could check her notes of the employer's testimony at the first trial.  In support of his request, defense counsel stated: "[The employer] testified then that his first impression was that she was upset and maybe it was financial difficulty, and he's testified directly opposite to that this time."

The trial court responded that defense counsel had laid no foundation for impeachment, as counsel had failed to ask the employer what he had testified to at the first trial.

It is evident from this colloquy that no transcript of the employer's testimony at the first trial was obtained by defense counsel prior to the retrial.  The record fails, however, to show why.  After the trial court's order of August 29, 1984 (five weeks prior to retrial), there is nothing in the record indicating that defense counsel was unable to secure the transcript be-cause of any shortage in the public defender's budget, nor is there any suggestion that defense counsel ever informed the trial court that any further or different order was necessary in order to enable defense counsel to get the transcript.  Significantly, there is no showing that defense counsel ever requested the court reporter to prepare the transcript.

What we have, therefore, is a record that fails to demonstrate that the lack of a transcript of the employer's prior testimony was attributable to any error, neglect, or omission by the trial court.

Appellant, in support of point 3, has supplied us a transcript of the employer's testimony at the first trial.  The employer, on that occasion, testified that the victim was in a "bad mood" when she came to work on January 13, 1984, and that he (the employer) "thought she had a problem, you know, a money problem or something, you know." This testimony, as we understand it, is the basis for appellant's point 3.

The vacuity of the point is readily apparent.

■■■  First, as the trial court aptly observed, defense counsel, at retrial, failed to lay the necessary foundation for admissibility of the employer's earlier testimony. Impeachment of a witness by a prior statement inconsistent with his trial testimony may be made only where the witness is asked whether he made such statement, and he denies doing so or states he cannot recall.  *State v. Vaughn,* 501 S.W.2d 839, 842[2] (Mo. banc 1973).  Secondly, the employer's suspicion as to the reason for the victim's bad mood was not only subject to objection as speculative and conjectural, but was also a collateral matter.  Therefore, even if defense counsel, at retrial, had asked the employer about his earlier testimony concerning his notion as to the reason for the victim's mood, appellant would have been bound by the employer's answer. *State v. Mooring,* 445 S.W.2d 303, 305–06[4] (Mo.1969).  Consequently, a transcript of the employer's testimony on that matter at the first trial, being extrinsic

proof, would not have been admissible to impeach him. *State v. Tolliver*, 562 S.W.2d 714, 717[1] (Mo.App.1978).

Point 3 is denied.

■ The only remaining assignment of error is point 2, which asserts that the trial court committed plain error in failing to discharge appellant or, in the alternative, failing to grant a mistrial, when the jury returned inconsistent verdicts of guilty and not guilty.

Pertinent to point 2, the transcript shows this:

"(Bailiff sworn by the Court and the jury retired at 5:23 to consider their verdict. At 6:17 the jury returned into open court with inconsistent verdicts. Jury retires again at 6:22 with new verdict forms. At 6:25 the jury returned into open court with their verdict. Each juror, upon being asked, 'Is that your verdict?' responded in the affirmative.)"

The verdict accepted by the trial court read:

"We, the jury, find the defendant Billie Wayne Poe guilty of rape as submitted in Instruction No. 5.

s/ George Fauvergue, Foreman"

Although the record is sparse, it appears that the jury initially returned with two verdict forms bearing the foreman's signature, one finding appellant guilty and the other finding him not guilty. While there is no record of what the trial court said, it is evident that the court rejected the verdict forms and supplied the jury new ones. The jury retired again, and returned three minutes later with the single signed verdict form quoted above. To make sure that this form reflected the jury's verdict, the trial court polled the jury. Rule 29.01(d), Missouri Rules of Criminal Procedure (15th ed. 1984). That procedure revealed unanimous concurrence.

Appellant maintains that the "inconsistent verdicts" initially returned rendered the jury's intent unascertainable, therefore he should have been discharged or awarded a new trial.

We disagree. What occurred here is identical with *State v. Johnstun*, 674 S.W.2d 86 (Mo.App.1984). There, the jury returned two verdict forms, each signed by the foreman. One found the accused guilty and assessed a 5-year sentence; the other found the accused not guilty. The trial court informed the jury that only one verdict form could be accepted. The court then furnished the jury new forms, and directed the jury to use only one in returning its verdict. The jury promptly returned one signed verdict form finding the accused guilty. Upholding the conviction, the opinion in *Johnstun* noted that the two forms initially returned were absolutely inconsistent, and the trial court could not possibly have construed them to arrive at the intention of the jurors. *Id.* at 92. The trial court thus acted correctly in rejecting such forms and returning the jury to the jury room with fresh forms. *Id.*

In the instant case, the trial court followed the *Johnstun* procedure, with the further step of polling the jury when it returned the second time with the single signed verdict form.

An episode similar to, though not identical with, the one in the instant case occurred in *State v. McMikle*, 673 S.W.2d 791 (Mo.App.1984). There, the trial court was handed a verdict form bearing the foreman's signature, stating that the jury had found the accused not guilty. When the court read the form aloud, the foreman stated he had signed the wrong form. The jury was sent back to deliberate further, and promptly returned with a signed verdict form finding the accused guilty and assessing punishment. At that point, the trial court ascertained from the foreman that the verdict form first returned was returned in error. The trial court then asked whether the second verdict form was the verdict of each and every juror. The foreman replied, "Yes." The trial court read the latter form aloud and asked accused's counsel whether he desired to poll the jury. Counsel declined. The conviction was upheld. *Id.* at 799, 800.

*Johnstun* and *McMikle* are dispositive of appellant's point 2. The point is, accordingly, denied, and the judgment is affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.